UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br>                              Plaintiff,<br><br>          v.<br><br>BOSTON SAND & GRAVEL COMPANY,<br><br>                    Defendant. | Case No. 19-cv-12004<br><br><br>**COMPLAINT** |

## INTRODUCTION

1.      Defendant Boston Sand & Gravel Company ("Boston Sand & Gravel") operates a ready-mix concrete manufacturing facility adjacent to the Millers River at 500 Front Street, Charlestown, Massachusetts (the "Facility"). On a number of instances on and before March 18, 2019, the company emitted visible plumes of particulate matter from the Facility into the atmosphere in violation of the Federal Clean Air Act and the Massachusetts Clean Air Act. Boston Sand & Gravel has also discharged polluted industrial stormwater into the Millers River in violation of the Federal Clean Water Act. Boston Sand & Gravel also has released sand, concrete, aggregate, cement, and their components ("Industrial Material") to the banks of the Millers River in violation of the Massachusetts Wetlands Protection Act.

2.      The Facility is in close proximity to several recreation areas, including Millers River Littoral Way bike path (adjacent), Galvin Memorial Park (less than 200 feet), North Point Park (less than 500 feet), and the Lynch Family Skatepark (less than 200 feet). The Skatepark is used primarily by young people, including teenagers and pre-teens who are more vulnerable than adults

to the adverse health effects of air pollution. Particulate matter ("PM") emitted from the Facility

can become suspended in the ambient air in and around the Facility, including in the ambient air

within these recreation areas. According to the United States Environmental Protection Agency

("EPA"), once inhaled, PM can affect the lungs and pulmonary and respiratory systems, causing

serious health effects.

3.      The Millers River is a state-listed impaired waterbody located along and under the North

section of the I-93 Highway Charles River Crossing. Although a major public amenity, the Millers

River remains impaired by numerous pollutants, including bottom deposits,

sedimentation/siltation, and turbidity. The Millers River meets with the Lower Charles River

(Segment MA72-38) a few hundred feet downstream of the Facility. The portion of the Charles

River immediately to the south of the Facility has been designated by the state as "Core Habitat"

and "Critical Natural Landscape," which are essential to the diversity of species and their habitats,

intact ecosystems, and resilient natural landscapes.[1]

4.      Excessive sediment discharged into waterways destroys habitat, harms aquatic organisms,

and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and

smothers bottom feeding organisms. Sediment becomes suspended in water, where it harms and

kills fish by clogging their gills, making it harder for them to breathe. Excessive sedimentation

harms the entire food chain by destroying habitat and killing the smaller organisms on which larger

ones depend. For example, sediment in the water column increases turbidity, reducing light

penetration, decreasing the ability of plant communities to photosynthesize, preventing animals

from seeing food, and reducing fish populations. Sediment may also increase the presence of

---

[1] BioMap2, Conserving the Biodiversity of Massachusetts in a Changing World, MA Department
of Fish & Game and The Nature Conservancy (2010), pg. 4.

nuisance species in a waterbody. In addition, certain chemical pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to sediment and are picked up by rainwater and snow-melt (jointly, "stormwater") as it washes across the land. Stormwater contaminated with these pollutants can significantly impact water quality when it is discharged to rivers and other waterbodies. Sediment can also alter the flow of water in a river and reduce the river's depth, contributing to flooding.

5.      The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Federal Clean Air Act, 42 U.S.C. § 7401, *et seq.,* the Federal Clean Water Act, 33 U.S.C. § 1251, *et seq*., the Massachusetts Clean Air Act. G.L. c. 111, § 142A, and the Massachusetts Wetlands Protection Act, G.L. c. 131, § 40. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Boston Sand & Gravel's unlawful emissions and discharges of pollution.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 304(a) of the Federal Clean Air Act, 42 U.S.C. § 7604(a), Section 505(a)(1)(A) of the Federal Clean Water Act, 33 U.S.C. § 1365(a)(1)(A), 28 U.S.C. § 1331 (an action arising under the laws of the United States) and 28 U.S.C. § 1367 (supplemental jurisdiction over related state claims).

7.      On January 10, 2019, plaintiff provided notice of Boston Sand & Gravel's violations of the Federal Clean Air Act and the Federal Clean Water Act, and of its intention to file suit against Boston Sand & Gravel (the "Notice Letter"), to the Administrator of EPA; the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Boston Sand & Gravel, as required by Section 505(b)(1)(A) of the Federal

3

Clean Air Act and Section 304(b)(1)(A) of the Federal Clean Water Act. *See* 42 U.S.C. § 7604(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A).

8.      More than sixty days have passed since notice was served.

9.      This action is not barred by any prior state or federal action to enforce the violations alleged in this complaint.

10.     The Commonwealth has an interest in protecting for its residents the integrity of the Massachusetts environment, and the related health, safety, economic, recreational, aesthetic and environmental interest that the environment provides. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Boston Sand & Gravel's failure to comply with environmental laws, as alleged herein. The relief sought herein will redress the harms to the Commonwealth caused by Boston Sand & Gravel's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

11.     Venue is proper in the District Court of Massachusetts pursuant to Section 304(c)(1) of the Federal Clean Air Act, 42 U.S.C. § 7604(c)(1), and Section 505(c)(1) of the Federal Clean Water Act, 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## PARTIES

12.     Plaintiff is the Commonwealth appearing by and through the Attorney General.

13.     The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the relief requested herein, under G.L. c. 12, §§ 3 and 11D.

4

14.     Defendant Boston Sand & Gravel is a domestic corporation that operates a ready-mix concrete manufacturing facility in Charlestown, Massachusetts. Boston Sand & Gravel has a long history of providing products to many construction projects throughout the region.

## STATUTORY BACKGROUND

### Federal Clean Air Act Requirements

15.     The Federal Clean Air Act sets out a comprehensive regulatory scheme designed to prevent and control air pollution. Congress passed the Clean Air Act in order to prevent air pollution and to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare. 42 U.S.C. § 7401.

16.     EPA has established National Ambient Air Quality Standards ("NAAQS") for a number of "criteria pollutants," such as particulate matter. *Id.* § 7409; 40 C.F.R. pt. 50. An area that meets the NAAQS for a particular criteria pollutant is deemed to be in "attainment" for that pollutant. 42 U.S.C. § 7407(d)(1). An area that does not meet the NAAQS is a "nonattainment" area. Id.

17.     Each state is required to develop a "state implementation plan" ("SIP") to achieve the NAAQS established by EPA. 42 U.S.C. § 7410(a). Specifically, SIPs set forth requirements for permitting programs and specific emission standards and limitations to assure that geographic areas either remain in attainment or regain attainment status. Once a state's SIP is approved by EPA, it is published in the Code of Federal Regulations and becomes enforceable federal law. 42 U.S.C. § 7413; 40 C.F.R § 52.23.

18.     Certain Massachusetts air pollution regulations designed to achieve and maintain attainment have been approved by EPA and incorporated into the Massachusetts SIP and are therefore enforceable under the Federal Clean Air Act. These regulations include provisions regulating emissions of dust.

19.     Any person may commence a civil enforcement action under the Federal Clean Air Act against any party "who is alleged to have violated … or to be in violation of [] an emission standard or limitation." *Id*. § 7604(a). An "emission standard or limitation" is, among other things, any standard or limitation under any approved State Implementation Plan. *Id.*, § 7604(f)(4).

20.     The Commonwealth is a citizen entitled to bring suit under 42 U.S.C. § 7604 because it is a "person" as defined by 42 U.S.C.  § 7602(e).

21.     This Court has authority to enjoin Boston Sand & Gravel's violations of the Federal Clean Air Act, and to impose penalties of up to $97,229 per day for each of the company's violations. *See* 42 U.S.C. §§ 7413(b), 7604(a), and 83 Fed. Reg. 1190, 1193 (Jan. 10, 2018). [2]

## Federal Clean Water Act Requirements

22.     The Federal Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a), and 402(p) of the Federal Clean Water Act; 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

23.     Polluted stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, nutrients, metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people. Excess sediment clouds the water and makes it difficult or impossible for many existing species in the water to grow. Sediment may also increase the presence of nuisance species in a waterbody. Excess nutrients cause algae blooms that

---

[2] The statutory maximum civil penalty for violations that occurred on or before November 2, 2015 is $37,500 per day, per violation. 40 CFR § 19.4, Table 1.

reduce dissolved oxygen in the water column, harming fish and other aquatic organisms. Bacteria and other pathogens can wash into swimming areas and create health hazards. Toxic pollutants can poison aquatic life. Land animals and people can become sick from eating diseased fish or ingesting polluted water.

24.     In order to minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015).

25.     Concrete manufacturing facilities are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-2.

26.     The Stormwater Permit requires these facilities to, among other things:

      a.     prepare a stormwater pollution prevention plan ("SWPPP") that, among other things, describes the facility and identifies all stormwater outfalls, Stormwater Permit, pg. 31;

      b.     submit to EPA a "Notice of Intent" to be covered by the Stormwater Permit that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates, Stormwater Permit, Appendix G;

      c.     ensure that pollutant control measures minimize pollutants in stormwater discharges, Stormwater Permit, pg. 14;

      d.     locate materials, equipment, and activities to contain potential spills, Stormwater Permit, pg. 15;

e.     minimize erosion by stabilizing exposed soils at the facility and use structural and non-structural control measures to minimize the discharge of sediment, Stormwater Permit, pg. 17;

f.     evaluate for and eliminate unauthorized non-stormwater discharges, Stormwater Permit, pg. 19;

g.     ensure that stormwater discharges do not cause or have the reasonable potential to cause or contribute to a violation of water quality standards, Stormwater Permit, pg. 20;

h.     implement specific best management practices applicable to concrete manufacturing facilities, Stormwater Permit, pg. 63;

i.     monitor stormwater discharges from all outfalls for compliance with benchmarks applicable to concrete manufacturing facilities, Stormwater Permit, pg. 63;

j.     report all monitoring results for all facility outfalls to EPA by specified deadlines, Stormwater Permit, pgs. 48-49;

k.     conduct corrective action to expeditiously eliminate excessive stormwater pollution and unauthorized non-stormwater discharges, Stormwater Permit, pgs. 27-29;

l.     conduct routine facility inspections at least quarterly (Stormwater Permit, pg. 22) and quarterly visual assessments (Stormwater Permit, pg. 24) to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not, Stormwater Permit, pgs. 22-26;

8

m.      timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions, Stormwater Permit, pgs. 49-50; and

n.      comply with any additional Massachusetts requirements, including but not limited the requirements of the Massachusetts Wetlands Protection Act and its implementing regulations. Stormwater Permit, pg. 170.

27.     Section 505(a)(1) and Section 505(f) of the Federal Clean Water Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).

28.     The Commonwealth is entitled to bring suit under Section 505 of the Federal Clean Water Act, because it is a "person" having an interest which is or may be adversely affected. *See* Section 505(g); 33 U.S.C.   § 1365(g).

29.     Under Section 505 of the Clean Water Act, this Court has authority to enjoin Boston Sand & Gravel from violating of the Stormwater Permit, and to impose penalties of up to $54,833 per day for each of the company's violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.1 - 19.4; 83 Fed. Reg. 2058 (Feb. 5, 2019).[3]

<u>**State Environmental Requirements**</u>

*Massachusetts Clean Air Act*

30.     The Massachusetts Clean Air Act is intended to protect the atmosphere from pollution and contamination. *See* G.L. c. 111, §§ 142A-142O ("Massachusetts Air Act").

---

[3] The statutory maximum civil penalty for violations that occurred on or before November 2, 2015 is $37,500 per day, per violation. 40 CFR § 19.4, Table 1.

31.     Pursuant to G.L. c. 111, § 142A, MassDEP has promulgated regulations that are designed to prevent pollution or contamination of the atmosphere.

32.     Pursuant to its authority under the Massachusetts Air Act, MassDEP adopted air pollution control regulations at 310 C.M.R § 7.00 et seq. ("Massachusetts Air Regulations") "to prevent the occurrence of conditions of air pollution where such do not exist and to facilitate the abatement of conditions of air pollution where and when such occur."  These regulations are designed to attain, preserve, and conserve the highest possible quality of the ambient air compatible with needs of society." 310 C.M.R. § 7.00 (preamble).

33.     The Massachusetts Air Regulations provide that "[n]o person having control of any dust … generating operations such as, but not limited to … aggregate manufacturing plants [or] … concrete batching plants" shall permit emissions therefrom which cause or contribute to a condition of air pollution. 310 C.M.R. § 7.09(1). They also provide that "[n]o person shall cause, suffer, allow, or permit the handling, transportation, or storage of any material in a manner that results or may result in emissions therefrom which cause or contribute to a condition of air pollution." 310 C.M.R. § 7.09(4). The Massachusetts Air Regulations at 310 C.M.R. § 7.01(1) state: "No person owning, leasing, or controlling the operation of any air contamination source shall willfully, negligently, or through failure to provide necessary equipment or to take necessary precautions, permit any emission from said air contamination source or sources of such quantities of air contaminants which will cause, by themselves or in conjunction with other air contaminants, a condition of air pollution."

34.     The Massachusetts Air Regulations at 310 C.M.R. § 7.00 define "air pollution" as the presence in the ambient air space of one or more air contaminants or combinations of air contaminants in such concentrations and of such duration as to cause a nuisance; be injurious or

potentially injurious to human or animal life, vegetation or property; or unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business.

35.     "Air pollution" is defined by the Massachusetts Air Regulations to mean "the presence in the ambient air space of one or more air contaminants or combinations thereof in such concentrations and of such duration as to (a) cause a nuisance; (b) be injurious, or be on the basis of current information, potentially injurious to human or animal life, to vegetation, or to property; or (c) unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business." 310 C.M.R. § 7.00.

36.     The Massachusetts Air Regulations also establish procedures and standards for MassDEP to issue approvals for plans to construct, alter or operate a facility or emission unit that may emit air contaminants to the ambient air ("Plan Approvals"). 310 C.M.R. § 7.02. Plan Approvals set conditions on the operation of emission sources, including specific emission limits that must be complied with and tracked or documented through monitoring, recordkeeping, reporting, or testing. *Id.*. Noncompliance with the terms of a Plan Approval is a violation of the Massachusetts Air Regulations. 310 C.M.R. § 7.02(3).

37.     General Laws c. 111, §§ 142A and 142B state that a person who violates the Massachusetts Air Act or the Massachusetts Air Regulations is liable for civil penalties of up to $25,000 per day per violation, and authorize this Court to enjoin further violations.

38.     The Attorney General has authority to enforce the Massachusetts Air Act and the Massachusetts Air Regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

*Wetlands Protection Act*

39.     The Wetlands Protection Act, G.L. c. 131, § 40, and its implementing regulations, 310 C.M.R. §§ 10.00 et seq. ("Wetlands Regulations"), establish a comprehensive regulatory scheme to

prevent damage to the Commonwealth's wetlands resource areas and to compel restoration of wetland resources that are illegally altered or filled.

40.     The Wetlands Protection Act and the Wetlands Regulations limit activities in various defined wetlands resource areas, including land under rivers, riverfront areas, and banks that border rivers. G.L. c. 131 § 40. Land under rivers, riverfront areas, and river banks serve many important functions, including improving water quality, reducing flood damage, preventing pollution, and protecting fisheries and wildlife habitat. 310 C.M.R. §§ 10.54(1); 10.56(1); 10.58(1). The alteration of river banks and riverfront areas can harm water quality by reducing the filtering of sediments, toxic substances (such as heavy metals), and nutrients (such as phosphorus and nitrogen) from stormwater.

41.     Accordingly, anyone who plans to conduct activities that may compromise those resources must notify, and obtain authorization from, the local Conservation Commission or MassDEP before commencing the activities. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a); 10.05(4)(a). It is also a violation to leave in place unauthorized fill, or otherwise fail to restore illegally altered land to its original condition. G.L. c. 131, § 40; 310 C.M.R. §§ 10.54(4); 10.56(4); 10.58(4).

42.     Under G.L. c. 131, § 40, a court may enjoin violations of the Wetlands Protection Act and may enter such orders as it deems necessary to remedy the violations, including orders to restore the altered resource to its original condition.

43.     Pursuant to G.L. c. 131, § 40, any person who violates the Wetlands Protection Act or the Wetlands Regulations shall be subject to a civil penalty of up to $25,000 for each violation, with each day such violation occurs or continues constituting a separate violation.

44.     The Attorney General has authority to enforce the Wetlands Protection Act and its implementing regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

## STATEMENT OF FACTS

### Description of the Boston Sand & Gravel Facility and Activities

45.     Boston Sand & Gravel manufactures and sells sand, stone and aggregate materials ("Industrial Material"), including ready-mixed concrete. The company produces ready-mixed concrete by combining various ingredients in different ratios in a system that includes aggregate batchers, aggregate bins, conveyors, mixers, heaters, cement silos, control panels and dust collectors.

46.     The Facility is comprised of approximately five acres and is within close proximity to several recreation areas, including Millers River Littoral Way bike path (adjacent), Galvin Memorial Park (less than 200 feet), North Point Park (less than 500 feet), and the Lynch Family Skatepark (less than 200 feet).

47.     A portion of its northeastern edge borders the Millers River (the "Millers River" or the "River"). MassDEP and EPA have included the Millers River on the list of impaired waterbodies pursuant to Section 303(d) of the Clean Water Act. Section 303(d) requires states to submit to EPA a list of impaired waters for which additional pollutant reduction regulatory measures are necessary. 33 U.S.C. § 1313(d). The Millers River is impaired by, among other things, excessive sedimentation and turbidity. The Lower Charles River is also impaired by, among other things, excessive sedimentation and lower dissolved oxygen.

48.     Boston Sand & Gravel moves Industrial Material around the Facility with heavy equipment, including in areas immediately above the banks of the Millers River on the Facility's northeastern edge.

49.     Boston Sand & Gravel has created piles of Industrial Material that are located at various locations at the Facility, including in areas near the banks of the Millers River on the Facility's western edge.

**Boston Sand & Gravel's Discharges and Emissions of Pollutants from the Facility**

*Excessive Dust Emissions into the Atmosphere*

50.     Boston Sand & Gravel's operations have resulted in the emission of dust – also known as PM – into the atmosphere. *See* Attachment A, a photograph illustrating an occurrence of excessive dust emissions that occurred at approximately noon on May 23, 2018; Attachment B, a photograph illustrating an occurrence of excessive dust emissions that occurred at approximately 9 a.m. on July 12, 2018.

51.     Excessive dust emissions from the Facility have emanated from one or more of the Facility's baghouses. A baghouse is an air pollution control device that filters out PM from industrial air emissions. A typical baghouse comprises an array of long, narrow bags that are suspended upside down in a large enclosure. Dust-laden air is blown upward through the bottom of the enclosure by fans. Particulates are trapped inside the filter bags, while cleaner air passes through the fabric and exits the baghouse.

52.     Exposure to PM can affect the lungs and pulmonary and respiratory systems, causing serious health effects, including irregular heartbeat, aggravated asthma, decreased lung function, and increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing.

53.     Boston Sand & Gravel's Industrial Material contains sand, stone and aggregate materials. Many of the ingredients in aggregate may have harmful health effects if inhaled.

54.     Some of the particulate matter that has been emitted by Boston Sand & Gravel at the

Facility has settled to the ground and other surfaces in the vicinity of the Facility. When

stormwater comes into contact with dust that has settled on and near the Facility, it mobilizes the

dust. Some of that dust has been discharged as sediment into the Millers River and the Lower

Charles River. Some of the dust that has been emitted by the Facility has also fallen directly into

these rivers.

*Boston Sand & Gravel's Noncompliance with*
*MassDEP's Air Emissions Plan Approval*

55.     Boston Sand & Gravel has permission from MassDEP to operate air pollutant emissions

units at its Facility pursuant to a Non-Major Comprehensive Plan Approval ("Plan Approval"),

issued by MassDEP on July 22, 2003.

56.     The Plan Approval contains numeric limits on PM emissions from each baghouse at the

Facility. Section C(2) of the Plan Approval states that emissions of PM of 10 microns in size or

less ("PM10") shall not exceed 0.011 grains per dry standard cubic feet, and that overall PM

emissions shall not exceed 0.032 grains per dry standard cubic feet.

57.     Emissions of PM10 and PM that meet the emissions limits in Section C(2) of the Plan

Approval are not visible to the naked eye.

58.     Boston Sand & Gravel's visible baghouse emissions exceeded the PM10 and PM emissions

limits in Section C(2) of the Plan Approval.

59.     Boston Sand & Gravel emitted visible levels of PM10 and PM from its baghouses on

numerous occasions since at least May 23, 2018. See Attachments A and B.

60.     Boston Sand & Gravel failed to "immediately cease operation" and notify MassDEP after it exceeded its baghouse emissions limits on PM10 and PM, as required by Section C(5) of the Plan Approval.

61.     Boston Sand & Gravel failed to take "immediate and appropriate steps to abate" the nuisance conditions caused by its excess PM10 and PM emissions, as required by Section D(1) of the Plan Approval.

*Sediment Discharges to the Banks of the Millers River*

62.     Boston Sand & Gravel's Industrial Material is sediment-laden. Sediment consists of loose sand, clay, asphalt, silt, or other material that mixes in the water column and settles at the bottom of a body of water.

63.     Boston Sand & Gravel's movement of Industrial Material around the Facility in the vicinity of the Millers River has resulted in the discharge of Industrial Material to the banks of the Millers River.

64.     Industrial Material from the piles above the banks of the Millers River has spilled through the containment structure onto the banks of the River.

65.     Industrial Material from the Facility is present on the banks of the Millers River at various locations, including but not limited to the vicinity of the Industrial Material piles.

*Polluted Stormwater Discharges to the Millers River*

66.     Areas at the Facility, including areas at the southern end of the Facility, are exposed to precipitation.

67.     Stormwater that comes into contact with Industrial Material at the Facility becomes contaminated with pollutants.

68.    Some stormwater that came into contact with Industrial Material on the surface of the Facility's southern section that became contaminated with pollutants has run off the Facility's southern section to the east and into the Millers River.

*Boston Sand & Gravel's Failure to Obtain and Comply with an EPA Stormwater Permit*

69.    Boston Sand & Gravel has permission from MassDEP and EPA to discharge treated and monitored process wastewater and stormwater to the Millers River through a single outfall – "Outfall 001" – pursuant to individual NPDES Permit No. MA0000531 (the "NPDES Permit"). The NPDES Permit does not authorize the discharge of stormwater at locations other than the single outfall.

70.    In addition to Outfall 001, there are other locations at the Facility where Boston Sand & Gravel discharges stormwater. These locations include, but are not limited to, areas on the southeast side of the Facility.

71.    Boston Sand & Gravel failed to notify EPA of the existence of these other stormwater discharge locations and failed to obtain permit coverage for these stormwater discharges in accordance with the requirements of the EPA Stormwater Permit or as part of its NPDES Permit.

*Boston Sand & Gravel's Failure to Seek Authorization from the Commonwealth for its Industrial Material Discharges*

72.    Boston Sand & Gravel never sought or received authorization from MassDEP under the Wetlands Protection Act to discharge untreated stormwater containing Industrial Material to the banks of the Millers River.

## FIRST CAUSE OF ACTION
### Violations of the Federal Clean Air Act:
### SIP Violations - Causing or Contributing to a Condition of Air Pollution
### 42 U.S.C. §§ 7604(a)

73.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

74.     Boston Sand & Gravel is a "person" within the meaning of 42 U.S.C. § 7604(a)(1).

75.     The Commonwealth is a "person" within the meaning of 42 U.S.C. § 7604(a).

76.     Boston Sand & Gravel is a "person" within the meaning of 310 C.M.R. §§ 7.00, 7.01(1), 7.09(1).

77.     The requirements of 310 C.M.R. §§ 7.01(1) and 7.09(1) are included in the Massachusetts SIP approved by EPA.  *See* https://www.epa.gov/sips-ma/epa-approved-regulations-massachusetts-sip.

78.     The requirements of 31 C.M.R. §§ 7.01(1) and 7.09(1) are "emission standard[s] or limitation[s]" within the meaning of 42 U.S.C. § 7604(a)(1). *See* 42 U.S.C. § 7604(f)(4).

79.     The Facility is an "air contamination source" within the meaning of 310 C.M.R. § 7.00 *et seq.*, as incorporated into the Massachusetts SIP.

80.     Boston Sand & Gravel's has emitted "air contaminants" into the air, within the meaning of 310 C.M.R. § 7.00 *et seq.*, as incorporated into the Massachusetts SIP.

81.     Boston Sand & Gravel's dust emissions into the ambient air near the Facility, which is located in close proximity to several recreation areas, have caused or contributed to a condition that is "potentially injurious to human or animal life" or will "unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business." 310 C.M.R. § 7.00 (definition of "Air Pollution"). Accordingly, Boston Sand & Gravel has violated 310 C.M.R.

§ 7.01(1), as incorporated in the Massachusetts SIP, which is an emission standard or limitation under the Federal Clean Air Act. *See* 42 U.S.C. §§ 7604(a)(1), 7604(f)(4).

82.     By permitting air contaminants to be emitted from its concrete batching plant that has caused or contributed to a condition of air pollution, Boston Sand & Gravel has violated 310 C.M.R. § 7.09(1), as incorporated in the Massachusetts SIP, which is an emission standard or limitation under the Federal Clean Air Act. *See* 42 U.S.C. §§ 7604(a)(1), 7604(f)(4).

83.     By allowing the handling, transportation, or storage of any material in a manner that has resulted in emissions therefrom which cause or contribute to a condition of air pollution, Boston Sand & Gravel has violated 310 C.M.R. § 7.09(4), as incorporated in the Massachusetts SIP, which is an emission standard or limitation under the Federal Clean Air Act. *See* 42 U.S.C. §§ 7604(a)(1), 7604(f)(4).

84.     Each of Boston Sand & Gravel's violations of 310 C.M.R. §§ 7.01(1), 7.09(1), and 7.09(4) is a separate and distinct violation of an emission standard or limitation under the Federal Clean Air Act for each day on which the violation occurred and/or continued.  *See* 42 U.S.C. § 7604(a).

**SECOND CAUSE OF ACTION**
**Violations of the Federal Clean Air Act:**
**SIP Violations - Failure to Comply with MassDEP Plan Approval**
**42 U.S.C. §§ 7604(a)**

85.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

86.     The requirements of 310 C.M.R. § 7.02, as relevant here, are included in the Massachusetts State Implementation Plan approved by EPA. Section 7.02 requires full compliance with the terms of MassDEP Plan Approvals.

87.     The conditions in Boston Sand & Gravel's July 22, 2003 Plan Approval are "emission

standard[s] or limitation[s]" within the meaning of 42 U.S.C. § 7604(a)(1). *See* 42 U.S.C.

§ 7604(f)(4).

88.     Boston Sand & Gravel has failed to operate its Facility in compliance with the conditions in

its Plan Approval by, among other things,

        a.  exceeding the baghouse PM10 and PM emissions limits set forth in Section C(2) of the

            Plan Approval;

        b.  failing to "immediately cease operation" and notify MassDEP following its excess dust

            emissions as required by Section C(5) of the Plan Approval; and

        c.  failing to take "immediate and appropriate steps to abate" the nuisance conditions

            caused by its excess dust emissions as required by Section D(1) of the Plan Approval.

89.     Each of Boston Sand & Gravel's violations of the conditions in its Plan Approval is a

separate and distinct violation of an emission standard or limitation under the Federal Clean Air

Act for each day on which the violation occurred and/or continued.  *See* 42 U.S.C. § 7604(a).

### THIRD CAUSE OF ACTION
### Violations of the Massachusetts Air Act:
### Causing or Contributing to a Condition of Air Pollution
### G.L. c. 111, § 142A; 310 C.M.R. §§ 7.01; 7.09

90.     The Commonwealth realleges and incorporates by reference the allegations contained in

the above paragraphs.

91.     Boston Sand & Gravel is a "person" within the meaning of 310 C.M.R. §§ 7.00, 7.01(1),

7.09(1).

92.     The Facility is an "air contamination source" within the meaning of 310 C.M.R. § 7.00 et

seq., as incorporated into the Massachusetts SIP..

93.     By emitting dust into the ambient air near the Facility, in close proximity to several

recreation areas, Boston Sand & Gravel has caused or contributed to a condition that is "potentially

injurious to human or animal life" or will "unreasonably interfere with the comfortable enjoyment

of life and property or the conduct of business." 310 C.M.R. § 7.00 (definition of "Air Pollution").

Accordingly, Boston Sand & Gravel has violated 310 C.M.R. § 7.01(1).

94.     By emitting dust from its concrete batching facility into the ambient air in close proximity

to several recreation areas, Boston Sand & Gravel has caused or contributed to a condition that is

"potentially injurious to human or animal life" or will "unreasonably interfere with the comfortable

enjoyment of life and property or the conduct of business." 310 C.M.R. § 7.00 (definition of "Air

Pollution"). Accordingly, Boston Sand & Gravel has violated 310 C.M.R. § 7.09(1).

95.     By allowing the handling, transportation, or storage of any material in a manner that results

or may result in emissions therefrom which cause or contribute to a condition of air pollution,

Boston Sand & Gravel has violated 310 C.M.R. § 7.09(4).

96.     Each of Boston Sand & Gravel's violations of the Massachusetts Air Act and sections

7.01(1), 7.09(1) and 7.09(4) of the Massachusetts Air Regulations is a separate and distinct

violation for each day on which the violation occurred and/or continued.

**FOURTH CAUSE OF ACTION**
**Violations of the Massachusetts Air Act:**
**Failure to Comply with MassDEP Plan Approval**
**G.L. c. 111, § 142A; 310 C.M.R. § 7.02(3)(f)**

97.     The Commonwealth realleges and incorporates by reference the allegations contained in

the above paragraphs.

98.     Boston Sand & Gravel is a "person" within the meaning of 310 C.M.R. §§ 7.00 and

7.02(3)(f).

99.     The Facility is a "facility approved under 310 CMR 7.02" within the meaning of 310 C.M.R. § 7.02(3)(f).

100.    By exceeding the baghouse PM and PM10 emissions limits set forth in Section C(2) of the Plan Approval, Boston Sand & Gravel has violated 310 C.M.R. § 7.02(3)(f).

101.    By failing to "immediately cease operation" and notify MassDEP after exceeding the baghouse PM and PM10 emissions limits as required by Section C(5) of the Plan Approval, Boston Sand & Gravel has violated 310 C.M.R. § 7.02(3)(f).

102.    By failing to take "immediate and appropriate steps to abate" the nuisance conditions caused by its excess PM and PM10 emissions as required by Section D(1) of the Plan Approval, Boston Sand & Gravel has violated 310 C.M.R. § 7.02(3)(f).

103.    Each of Boston Sand & Gravel's violations of 310 C.M.R. § 7.02(3)(f) is a separate and distinct violation of  the Massachusetts Air Act for each day on which the violation occurred and/or continued.

### FIFTH CAUSE OF ACTION
### Unpermitted Discharges of Stormwater Associated with Industrial Activity
### Violations of Section 301(a) of the Federal Clean Water Act; 33 U.S.C. § 1311(a)

104.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

105.    Boston Sand & Gravel's material piles are "point sources" within the meaning of Section 502(14) of the Federal Clean Water Act. 33 U.S.C. § 1362(14).

106.    The heavy machinery that Boston Sand & Gravel uses to move material around the Facility are "point sources" within the meaning of Section 502(14) of the Federal Clean Water Act. 33 U.S.C. § 1362(14).

107.    The gulleys, channels, and fissures in the Industrial Material piles and on the Millers River's banks created by runoff from the Boston Sand & Gravel Facility are "point sources" within the meaning of Section 502(14) of the Clean Water Act. 33 U.S.C. § 1362(14).

108.    Industrial Material is a "pollutant" within the meaning of Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6).

109.    Boston Sand & Gravel's stormwater discharges are "stormwater discharge[s] associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14).

110.    Boston Sand & Gravel is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

111.    The Millers River is a "navigable water," within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

112.    By discharging stormwater associated with industrial activity to the Millers River from locations at the Facility other than Outfall 001, Boston Sand & Gravel has violated the Clean Water Act's prohibition on discharges from point sources not authorized by any NPDES permit. *See* Sections 301(a), 402(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

113.    These violations establish an ongoing pattern of failure to comply with the Clean Water Act's prohibition against unpermitted discharges.

114.    Each of Boston Sand & Gravel's violations of the prohibition against unpermitted discharges is a separate and distinct violation of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a), for each day on which the unpermitted discharge occurred and/or continued.

**SIXTH CAUSE OF ACTION**
**Violations of the Massachusetts Wetlands Protection Act and the Wetlands Regulations:**
**G.L. c. 131, § 40; 310 C.M.R. § 10.00**

115.    The Commonwealth realleges and incorporates by reference the allegations contained in

the above paragraphs.

116.    The Wetlands Protection Act and its implementing regulations provide, with exceptions not

relevant here, that no person shall remove, fill, dredge, or alter areas subject to that Act's

protection, or cause, suffer, or allow such activity, without first filing a Notice of Intent with the

appropriate local Conservation Commission and obtaining an Order of Conditions from the

Conservation Commission or a Superseding or Final Order of Conditions from the MassDEP

permitting the activity.  *See* G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a).

117.    The Wetlands Protection Act defines "person" to "include any individual, group of

individuals, . . . partnership, . . . company, . . . or any other legal entity or its legal representative,

agents or assigns."  G.L. c. 131, § 40.

118.    Areas subject to the protection of the Wetlands Protection Act and its regulations include

river banks. *See* G.L. c. 131, § 40; 310 C.M.R. § 10.02(1).

119.    Pursuant to 310 C.M.R. § 10.04, "fill" means "to deposit any material so as to raise an

elevation, either temporarily or permanently."

120.    Pursuant to 310 C.M.R. § 10.04, "alter" means "to change the condition of" any area

subject to the protection of the Wetlands Protection Act, including, without limitation, "the

changing of pre-existing drainage characteristics, . . . sedimentation patterns, flow patterns and

flood retention areas," and "the destruction of vegetation."

121.    Boston Sand & Gravel is a "person" within the meaning of G.L. c. 131, § 40, and 310

C.M.R. §§ 10.00 et seq.

24

122.     The area beneath the Facility's northeastern edge and above the mean annual low flow level of the Millers River is river "bank" as defined in the 310 C.M.R. § 10.54(2).

123.     By discharging Industrial Materials onto the banks of the Millers River, Boston Sand & Gravel has altered or filled an area subject to the protection of the Wetlands Protection Act and its regulations.

124.     Boston Sand & Gravel's alteration or filling of banks of the Millers River was not authorized by any Order of Conditions or Superseding Order of Conditions.

125.     By altering or filling banks of the Millers River without an Order of Conditions from the Boston Conservation Commission or Superseding Order of Conditions from MassDEP, Boston Sand & Gravel has violated the Wetlands Protection Act and the Wetlands Regulations. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a),10.05(4)(a).

126.     By allowing the unauthorized fill to remain in place on the River's banks, Boston Sand & Gravel has violated and continues to violate G.L. c. 131, § 40 and 310 C.M.R. § 10.02(2)(a).

127.     Each of Boston Sand & Gravel's violations of the Wetlands Protection Act and its implementing regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

## RELIEF REQUESTED

Wherefore, the Commonwealth respectfully requests that this Court grant the following relief:

1.     Require Boston Sand & Gravel to comply with the terms of MassDEP's 2003 Plan Approval for the Facility;

2.     Eliminate unpermitted discharges of industrial stormwater from the Facility to the Millers REiver from locations at the Facility other than Outfall 001;

25

3.      Enjoin Boston Sand & Gravel from:

      a.  emitting excessive levels of PM and PM10 into the ambient air in from the Facility; and

      b.  discharging Industrial Material to the banks of the Millers River without the necessary approvals under the Wetlands Protection Act;

4.      Order Boston Sand & Gravel to pay civil penalties of up to:

      a.  $37,500 per day for each violation of the Federal Clean Air Act that occurred on or before November 2, 2015, and civil penalties of up to $97,229 per day for each violation of the Federal Clean Air Act that occurred after November 2, 2015, pursuant to 42 U.S.C. §§ 7413(b), 7604(a), 40 CFR § 19.4, and 83 Fed. Reg. 1190, 1193 (Jan. 10, 2018);

      b.  $37,500 per day for each violation of the Federal Clean Water Act that occurred on or before November 2, 2015, and civil penalties of up to $54,833 per day for each violation of the Federal Clean Water Act that occurred after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Federal Clean Water Act, 33 U.S.C. §§ 1319(d), 1365(a), 40 CFR § 19.4, and 84 Fed. Reg. 2058 (Feb. 5, 2019);

      c.  $25,000 for each day of each violation of the Massachusetts Air Act, G.L. c. 111, § 142A, to the Commonwealth;

      d.  $25,000 for each day of each violation of the Wetlands Protection Act, G.L. c. 131, § 40, to the Commonwealth; and

5.      Order Boston Sand & Gravel to take appropriate actions to restore the quality of protected resource areas and waterways impaired by its activities;

6.      Award the Commonwealth's costs (including reasonable investigative, attorney, witness,

and consultant fees) as authorized by the Federal Clean Water Act, 33 U.S.C. § 1365(d), and the

Federal Clean Air Act, 42 U.S.C. § 7604(d); and

7.      Award any such other and further relief as this Court may deem appropriate.

Dated:

                                        Respectfully submitted,

                                        COMMONWEALTH OF MASSACHUSETTS

                                        By its attorneys,

                                        MAURA HEALEY
                                        ATTORNEY GENERAL

                                        */s/ Nora J. Chorover*
                                        Nora J. Chorover (Bar No. 547352)
                                        Special Assistant Attorney General
                                        Environmental Protection Division
                                        Office of the Attorney General
                                        One Ashburton Place, 18th Floor
                                        Boston, Massachusetts 02108
                                        Tel: (617) 727-2200, ext. 2436
                                        Nora.Chorover@state.ma.us


                            CERTIFICATE OF E-SERVICE

        I hereby certify that this Complaint, filed electronically through the ECF system with the
Court on September 24, 2019, has been sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and copies will be sent to those indicated as
non-registered participants on September 24, 2019.

                                */s/ Nora J. Chorover*
                                Nora J. Chorover (Bar No. 547352)